IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2012

## JOSEPH MAY v. STATE OF TENNESSEE

**Appeal from the Criminal Court of Shelby County**
**No. 04-03616     J. Robert Carter, Judge**

—————————

**No. W2011-01183-CCA-R3-PC  - Filed August 1, 2012**

—————————

Joseph May ("the Petitioner") filed for post-conviction relief from his conviction of first degree premeditated murder. The Petitioner contends that his trial lawyer provided ineffective assistance of counsel. After an evidentiary hearing, the post-conviction court denied relief. This appeal followed. Upon our careful review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

R. Todd Mosley, Memphis, Tennessee, for the appellant, Joseph May.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Betsy Weintraub, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## Factual and Procedural Background

In September 2006, a jury convicted the Petitioner of one count of first degree premeditated murder, committed in January 2004. The trial court subsequently sentenced the Petitioner to life imprisonment. This Court affirmed the Petitioner's conviction and sentence on direct appeal. See State v. Joseph May, No. W2006-02479-CCA-R3-CD, 2009 WL 1585810, at *10 (Tenn. Crim. App. June 8, 2009). In addressing the Petitioner's direct appeal, this Court summarized the proof adduced at trial as follows:

The evidence presented at the trial established that the victim, Tonya Turnage, died after having been hit over the head with a glass bottle and stabbed multiple times by the defendant. On the morning of January 14, 2004, the victim's body was discovered by Ursula Leflore. Ms. Leflore testified that while she was delivering newspapers, she discovered a body, which was later identified as the victim, lying face down in the street at the intersection of Dunn and Dearing. Ms. Leflore immediately left the intersection and called the police to report the body. At the trial, Ms. Leflore identified photographs of the victim's body taken at the location where she was found.

Michael Rawlins with the Memphis Police Department testified that at approximately five o'clock in the morning on January 14, 2004, he responded to "a man down call." Upon arriving at the intersection of Dunn and Dearing, he "observed a female body in the middle of the street . . . and a lot of blood . . . around the body." Officer Rawlins checked the body and found it was cold and had no pulse. Photographs depicting the scene and the body surrounded by blood were identified by Officer Rawlins and made exhibits at the trial.

David Galloway with the Memphis Police Department Crime Scene Unit stated that on January 14, 2004, he responded to a crime scene call at the intersection of Dunn and Dearing in Memphis, Shelby County. His duties as a crime scene officer were to capture the scene through photographs and sketches and to collect evidence. He recalled that when he arrived at the scene, a clothed body was lying in the street and "what appeared to be blood was coming from different parts of her body." Officer Galloway identified his sketch of the scene which was made an exhibit at the trial. The body was found without shoes, a purse, or identification. Photographs depicting clothing and jewelry worn by the victim and injuries to the victim's arm, side, and hand were taken by Officer Galloway and identified by him at the trial. On cross-examination, Officer Galloway described the neighborhood where the body was found as residential with mostly single family houses.

Sergeant T.J. Helldorfer with the Homicide Bureau of the Memphis Police Department testified that on January 18, 2004, he was assigned to advise Joseph May of his Miranda rights before he gave a statement. Sergeant Helldorfer identified the defendant at trial as Joseph May and also identified an advice of rights form signed by the defendant. Sergeant Helldorfer stated that the form was executed during an interview of the defendant conducted by himself and Sergeant J.R. Howell. After the defendant was advised of his rights, he signed consent forms for the searches of 1318 Briarwood, the

defendant's home, and a 1978 Chevy pickup truck, the defendant's vehicle. Sergeant Berryman then took a statement from the defendant while Sergeant Helldorfer interviewed the defendant's mother. Sergeant Helldorfer stated that the defendant and his mother came into the homicide office of their own accord. He recalled that the defendant was calm and reserved.

Nathan Berryman with the Homicide Squad of the Memphis Police Department testified that he assisted Sergeant Helldorfer with the investigation of the victim's death. Lieutenant Berryman stated that the defendant was brought to the homicide office by his stepfather and mother because "he wanted to confess the killing of this victim." After the defendant waived his rights, Lieutenant Berryman spoke with the defendant. Lieutenant Berryman identified a four page written statement signed by the defendant which was made an exhibit and read aloud to the jury. The statement reads in pertinent part:

> Sergeant Helldorfer: Do you wish to make a statement now?
>
> The Defendant: Yes.
>
> Sergeant Helldorfer: Are you aware that we are investigating the death of Tonya Turnage?
>
> The Defendant: Yes.
>
> Sergeant Helldorfer: Joe, are you responsible for Tonya's death?
>
> The Defendant: Yes, sir.
>
> Sergeant Helldorfer: Could you tell me in as much detail as possible what occurred before, during and after, Tonya and it says Trudge's-death. Should that be Turnage?
>
> The Defendant: Yes. That should be. Answer: I like to get high and pick up women[,] on Tuesday night [ ] I went out. I picked up a woman around the Barron and Semmes area.
>
> . . . .

I picked her up on the way back to the house and asked her if she liked to get high? So we came to the conclusion that we were going to smoke dope . . . and have sex. We get back to the house. The first thing we do is get high together. Then we have sex, . . . . After that, we continue to get high. About an hour and a half later we got done smoking. She got upset with me. She thought that . . . I [was] going to get her some money for the sex we had. Once I told her that I didn't have any money, she threw a tantrum with me. At this time, we were sitting on the couch in my living room, . . . . At this time she told me that she want[ed] some f* * *ing money. At this time I told her, I didn't have any money to give her. Now, she's getting really hostile with me. She's screaming at me. I have a knife on my coffee table. She grabbed the knife and begins to up the blade [ ]. And she is to the left of me. I grabbed a bottle and hit her in the head with the bottle. At this time, when I hit her in the head, she fell over. Then she fell over on the knife. I think that she pulled the knife out or it fell out. I'm not really for sure. Then she [got] up and [is] coming at me. She lunges at me and I hit her two more times with the bottle. The third time the bottle broke. Due to us-both of us being high, it's [sic] nothing slowing her down. She gets back up and [is] wrestling around, there was another knife under the cushions of my couch. I believe at this time I stabbed her in the throat with the knife. After that time, I am scared. I try to put her in the truck. I pull the truck in the garage. I brought her out through the window. I drove around two miles down the street. I think it was Dunn Street. I put her out on the street . . . [b]y the curb. I wipe down my truck and put my clothes in the washing machine. I put a drop cloth over the carpet. When I get back to the house, it is about two a.m.

According to Lieutenant Berryman, the defendant reported that when he picked up the victim he had "about six rocks" of crack cocaine. The defendant described the knife that the victim grabbed as "a folding knife" and the knife that he pulled from under the couch as "[a] knife with a sheath." The defendant told Lieutenant Berryman that he was unsure how many times he stabbed the victim because they "were scuffling." When asked what he did with the wine bottle that he used to hit the victim, the defendant said that he "threw it in the trash." The defendant was photographed and asked if he had injuries and he indicated that he did not. Lieutenant Berryman described the

-4-

defendant's demeanor during his interview as calm. On cross-examination, Lieutenant Berryman agreed that if the defendant had not turned himself in, the case would have been very difficult to solve.

Memphis Police Department Officers Merritt, Sousoulas, and Jacobs testified regarding the search of the defendant's residence and vehicle and the recording and custody of the evidence found. Officer Merritt testified that after the defendant signed a consent form for the search of his residence, he went to 1318 Briarwood to conduct the search. Upon entering the house, Officer Merritt noticed that a paint drop cloth covered the entire floor of the living room. The living room furniture was sitting on top of the drop cloth. A substance believed to be blood was found on the living room carpet, items of clothing, shoes, boots, the arm of a love seat, and underneath the middle cushion of the couch. Photographs of the living room included one of a knife in a sheath. Officer Merritt stated that the photograph showed the knife exactly as it was found under the middle cushion of the couch. Officer Merritt stated that samples were taken from the carpet, the couch, a comforter on the couch, and a table. Items were collected from the house including the knife in the sheath and the defendant's shoes. Officer Merritt stated that the defendant's vehicle was taken to a storage lot for a later search. Police did not find the victim's shoes, purse, or identification inside the house.

Officer Sousoulas identified the evidence taken from the house including a knife in a sheath, which was made a trial exhibit. Officer Jacobs testified that he processed and photographed a truck that had been towed from 1318 Briarwood. He stated that in the bed of the truck he found a hatchet with a wooden handle and what appeared to be blood on the tailgate. The hatchet was tagged as evidence and the tailgate was swabbed to be tested for the presence of the victim's blood. On cross-examination, Officer Jacobs stated that there was also a toolbox, assorted oil bottles, a glass bottle, and a spare tire in the bed of the defendant's truck which were not inventoried.

Doreen Shelton with the Memphis Police Department assigned to the Homicide Bureau testified that she was present when a nurse obtained a blood sample from the defendant to compare with the samples found at his residence. Lieutenant Shelton also received samples taken from the victim at the Regional Medical Forensic Center. Blood samples from both the defendant and the victim were identified by Lieutenant Shelton and admitted as trial exhibits. Ernestine Davison with the Memphis Police Department testified that she

delivered the blood samples from the victim and the defendant along with other evidence to the Tennessee Bureau of Investigation for analysis.

Sergeant J.M. Oliver with the Memphis Police Department testified that he retrieved a pocket knife contained in a plastic bag from the residence of the defendant's parents in Olive Branch, Mississippi. According to Sergeant Oliver, the defendant's parents told him that "they had handled the knife." The pocket knife was made an exhibit at the trial.

Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation, testified that the defendant's DNA was identified on rectal swabs taken from the victim. Tests further identified the victim's blood on three living room carpet samples, the fabric sample from the arm of the couch, and a large knife. Tests revealed a partial verification of the victim's blood on samples taken from the defendant's truck. Agent Nelson explained that the partial verification indicated the sample was degraded. Tests failed to reveal the victim's blood on the pocket knife or the hatchet.

Dr. O.C. Smith, Shelby County Medical Examiner, testified that in January of 2004 he performed an autopsy on an individual identified as the victim, Tonya Turnage, a thirty-four year old woman. The autopsy revealed that the victim sustained injuries including multiple stab wounds and cutting wounds to the neck and torso, tears to the scalp, underlying fractures, and bleeding about the brain. The cause of the victim's death was officially listed as "multiple injuries." Dr. Smith stated that there were two tears on the victim's scalp indicating blunt force injuries including a large tear of three and three quarter inches above and behind her left ear, and smaller tears involving the top of the ear. There was another tear on the back of the victim's head caused by a blunt force. The victim's blood was tested for both cocaine and metabolite, a breakdown product of cocaine. Tests revealed that the victim's blood levels of both cocaine and its metabolite were in the upper range for recreational use of cocaine. Dr. Smith testified that "[n]ormal recreational use would be .1, sometimes .2 and [the victim's level was] .255."

According to Dr. Smith, there were scrapes and tears from the victim's lip to her right check and the bridge of her nose consistent with "road rash." Dr. Smith explained that "road rash" was most often seen when a body had suffered forced contact with pavement, gravel, or concrete. Sharp force injuries of two types were present on the victim's neck. The first type of wound was superficial, going down only to the protective layer covering the

neck muscles and was inflicted using a slicing motion. The second type of sharp force injury was a stab wound caused by the insertion of a sharp object "into the neck and in an upward direction . . . causing damage to the carotid artery and the jugular vein, cutting across the windpipe." Dr. Smith explained that this injury would have "cause[d] brisk bleeding" and would also have caused the victim "to breathe blood into her lungs." Dr. Smith estimated that there were two passes with a knife on the right side of the victim's neck and three passes with a knife on the left side of her neck. There was also a shallow stab wound with skin scraping and bruising found on the victim's right forearm and two incised wounds on the victim's right middle finger. Dr. Smith stated that there were five stab wounds to the victim's abdomen and chest which resulted in damage to her lungs and liver.

Without knowing the exact sequence of events, it was difficult for Dr. Smith to determine the order that the injuries were received. However, he stated, with the exception of some tears inside the victim's lip, all of the injuries appeared to have occurred while the victim was alive. Dr. Smith specifically testified that the scraping injuries on the victim's head and face occurred while the victim was still alive. Dr. Smith agreed that the wounds on the victim's arm and finger were consistent with "defensive wounds." However, he clarified that the term "defensive wound" evolved as "a term of art in forensics" from seeing injuries that had occurred in an attempt to deflect a sharp edge. Dr. Smith stated the term was not a diagnostic criterion. Photographs taken during the autopsy of the victim were entered into evidence as trial exhibits.

On cross-examination, Dr. Smith stated that an examination of the victim indicated that there was not any trauma or forced entry during sex. He stated that he believed that the wounds to the torso were "more likely to have been inflicted by the smaller knife[.]" The area of the brain that would have been affected by blunt trauma injuries to the victim's head "were not those areas that would require a person to either lose consciousness or lose control of their body." Dr. Smith agreed that the use of cocaine affected everyone differently "within certain guidelines." He further agreed that the use of cocaine could affect a person's judgment, temperament and overall personality and could cause agitation and create a drive to get more cocaine. On redirect examination, Dr. Smith agreed that the wounds to the torso could not have been caused by the victim falling on a knife, nor could the injuries to the neck have been caused by only one stabbing.

Carol Turnmire, the defendant's mother, testified that she and her husband owned the house on Briarwood and that the family had lived there until they moved to Mississippi. After she and her husband moved, the defendant and Ms. Turnmire's daughter continued to live in the house on Briarwood. Ms. Turnmire recalled that in 1998, she discovered that the defendant was on crack and "taking Oxycotin and several other things." The defendant entered a drug rehabilitation center in Mississippi. After the defendant left the rehabilitation center, he moved to New Albany with his wife in an effort to reconcile their marriage. However, in 2000, the defendant and his wife separated and he moved back into the Briarwood house with his girlfriend and lived there intermittently from 2000 to 2004. Ms. Turnmire stated that the last time that the defendant moved back into the house on Briarwood, he had been living with his girlfriend who "kicked him out of the house because of drug use." Ms. Turnmire knew that the defendant was still having a drug problem and spent his entire weekly paycheck of five to six hundred dollars on crack cocaine. She and her husband had allowed the defendant to move back into the house on Briarwood and the defendant had agreed to help get the house ready to sell.

Ms. Turnmire spoke with the defendant on the telephone on Monday night, January 12th or 13th, 2004. On the following Thursday, after Ms. Turmire had not been able to reach the defendant, she drove by the house on Briarwood, but she did not see his truck. On Friday, Ms. Turmire and her husband went to the house and knocked for a long time, and the defendant finally came to the door. As Ms. Turmire stepped into the house, she saw a drop cloth on the living room floor and she thought that the defendant had started doing work to sell the house. The defendant did not look well and Ms. Turnmire told him she was taking him to her house in Mississippi. She and her husband then picked up the defendant's son, who lived around the corner, and they spent Saturday in Mississippi. On Sunday, the defendant told Ms. Turnmire that "he killed the girl that they found on Dearing." The defendant told her that he "picked [the victim] up and I took her back to the house and we were smoking crack and we got into a fight over the crack and it was crazy and things were crazy and I stabbed her." The defendant agreed to go to the police and Ms. Turnmire, her husband and her daughter took him to the police station where he gave a statement. Ms. Turmire also gave a statement and asked the police to put the defendant on suicide watch because he was so upset. On cross-examination, Ms. Turnmire stated that she first became aware that the defendant kept a large knife at the house about three years ago when someone tried to break into the house.

The defendant testified that he was twenty-nine years old, had two children, and had been employed doing residential fire and water damage repair work. He first used crack cocaine when he was eighteen years old, and by the end of 2002 to 2003, he "got really strung out on crack." In June of 2003, he spent "five days in detox" followed by "thirty days in rehab." However, within four or five months, he "was back on it again." According to the defendant, he started picking up prostitutes in 1998, and since then, he had been using prostitutes on a weekly basis. The defendant moved back into the house on Briarwood on December 26, 2003, after a fight with his girlfriend. At that time, he was using crack cocaine on a daily basis. The defendant bought the crack cocaine from a "guy that [the defendant] had known, [and] had been dealing with since 2000."

The defendant stated that on the night of his encounter with the victim, he was at his house by himself, had some dope and was lonely. He went to an area where he knew there to be prostitutes and "picked up one prostitute but . . . she didn't want to go back to the house and smoke dope[.]" The defendant then saw the victim. He claimed that the victim flagged him down and he propositioned the victim and told her "there wasn't no money involved." According to the defendant, "the stipulation was [they] would go back to the house, smoke the dope, and have a little fun sex, and [he] would bring her back." The defendant stated that the victim agreed and they went to his house and "got a little high. And [they] had sex. Then [they] started getting high again[.]" At about eleven thirty that evening, the victim became agitated when the defendant "ran out of dope." The defendant stated that "at that point, she had asked [him] for some money." He told the victim that he did not have any money, and "she reached down to the coffee table and grabbed the pocket knife." The defendant said that when "she went for that pocket knife . . . [he] struck her with the bottle[,]" hitting her two or three times before the bottle broke. He recalled that the victim fell to the floor and got up and they were "squalling" when he fell and she fell on top of him. The defendant stated that he then "grabbed the knife from the cushion and [he] stabbed her with it." The defendant stated that the knife was from his knife collection, and that it had been under the cushion since he moved back into the house. The defendant could not recall how long the fight lasted. His testimony regarding what happened after stabbing the victim continued as follows:

> Defendant: I didn't have no phone in the house. I didn't have no cell phone. It wasn't an option for me to pickup 9-1-1 and call them. Really, I freaked out . . . . I'm seeing Tonya there.

-9-

She's lifeless, I didn't . . . check for a pulse. I didn't check to see if she was dead.

. . . .

Counsel: Did she look dead to you . . . . [Y]ou didn't check for a pulse[?]

The Defendant: No, she was actually . . . turned away from me on the floor. She wasn't moving . . . . I suppose she was lifeless. I didn't check. I couldn't tell you.

Counsel: Were you still high on crack cocaine at this point?

The Defendant: Yes, ma'am. I was still coming down off the aftermath[ ] of crack.

Counsel: And what did you do next?

The Defendant: Like I said, I got scared. I didn't know what to do. So I made a decision, I mean it wasn't a logical decision, I just made a decision that I was going to place her in the truck and place her somewhere where somebody could find her and that's what I did. I didn't even drive that far from the house. It wasn't even-less than two miles from where I lived at and I placed her there in the street. I mean, you know, that I jumped out the truck and I ran and yanked her out and bawled off, you know, I mean-I wasn't trying to hide her. I didn't-you know, I didn't think about putting her in a dumpster. It was a logical place for me to do it so somebody would find her and maybe get medical attention if she was still alive or what-you know, it was just-

Counsel: Do you have any idea what time it was at this point?

The Defendant: I had no clock at the house. I got an alarm clock, but I believe it wasn't set right. I could tell you, it was probably, give or take, one or two o'clock in the morning.

Counsel: And so the street lights were on in that area. Was it a well lit area or dimly lit or do you recall?

The Defendant: As I recall, it was a lighted area. You know, I have lived on that street when I was a kid. I was familiar with the area and there was a church right there. But the church is right here across the street, and that's the street there, and that's where she was found. I-you know, I believe it was a very lit area, it wasn't total darkness.

The defendant stated that he then went home and lay down on the couch. He recalled that he was supposed to be at work and his team leader came by the house and knocked on his door. The defendant did not let his team leader in the house because "of what was on the floor there, the blood." The defendant told the team leader he was not coming to work. After his team leader left, the defendant put a tarp over the carpet and wiped off the knife. He stated that he "got some dope that Thursday, and [he] got high," and on Friday, he went "to work to get [his] paycheck because [he] wanted to get high." The defendant recalled that later on Friday, his parents came by the house and told him they were going to get his son and take them to Mississippi. On Sunday morning while he was in the car with his mother, he told her that he was "responsible for that woman they found on Dearing and Dunn." The defendant stated that although he was scared, he "came in voluntarily and [he] told them what-what had happened."

On cross-examination, the defendant agreed that in his statement to the police, he said nothing about wanting the victim to have medical attention, but stated that he did not have an attorney present and just gave the police a summary of what happened. The defendant stated that he hit the victim on the side of the head with the bottle as she was coming toward him with a knife and then hit her a second time on the back of the head as a reaction after the first swing. The defendant agreed that he told the police that he did not have any injuries. The defendant further agreed that he made the decision not to take the victim out the front door, but instead, took her out the window into the garage to avoid being seen. He conceded that he put the victim in the truck and left her body in the street. When asked if the victim was still alive when he left her body in the street, the defendant stated he "had no idea that she was or was not," but claimed it was his intention that someone find her and get her medical attention. On redirect examination the defendant stated that he turned

-11-

himself in because he knew he was responsible for what happened to the victim and for his decisions, and stated he "couldn't live with [himself]."

Id. at *1-8.

On the basis of this proof, the State emphasized during closing argument the number and severity of the wounds, contending that "[a] knife is an intimate weapon that requires you to think and to act in a terrible way, but [sic] to take deliberate and intentional steps to use it and to kill somebody." The State also referred to the Petitioner's conduct after he finished stabbing the victim as trying to "get away" with the crime, and to his decision to dispose of the victim while she was still alive and without calling for aid. However, the prosecutor followed this latter argument with the following: "He wanted this woman dead so he left her in the street. He thought she was dead probably, already, and he left her in the street. Because what he intended to do, to kill her, was accomplished, and he dumped her off." The defense argued that the Petitioner had not committed premeditated murder but had been defending himself against the victim and, at some point, the Petitioner's actions crossed the line from self-defense to voluntary manslaughter. The jury rejected the defense theory and convicted the Petitioner of first degree premeditated murder. On appeal, the Petitioner contended that the evidence was not sufficient to support the elements of intent and premeditation. See Tenn. Code Ann. § 39-13-202(a)(1), (d) (2003) (setting forth the elements of first degree premeditated murder). This Court concluded that the evidence was sufficient to support the conviction on the basis of the number and nature of the victim's wounds, the Petitioner's failure to render aid to the victim, and the Petitioner's attempts "to hide and destroy the evidence of his crime." Joseph May, 2009 WL 1585810, at *9. Accordingly, this Court affirmed the Petitioner's conviction and sentence. Id. at *10.

The Petitioner subsequently filed the instant petition for post-conviction relief, alleging that he had received ineffective assistance of counsel at trial. The following proof was adduced at the post-conviction hearing:

Michael Scholl testified as an attorney with expertise in the field of criminal defense. Scholl testified that he had been involved in "well over one hundred" murder cases and had handled issues involving the victim's time of death and whether particular injuries had been inflicted before or after death. He stated that when the victim's time of death was at issue it was appropriate to obtain an expert opinion independent of the medical examiner's office. He explained that when the defendant is indigent state funds may be available to hire an independent expert. Scholl briefly summarized the process for requesting such funds from the trial court.

-12-

The Petitioner testified that he met with his trial lawyer ("Trial Counsel") several times before trial. He told her that the victim had started the fight. He wanted Trial Counsel to call the victim's sister as a witness because the sister previously had made statements that the victim "carried a knife and was aggressive and a fighter." At trial, however, the prosecution called the sister as a witness and Trial Counsel conducted no cross-examination. He also discussed with Trial Counsel a potential witness who previously had been the victim's boyfriend and who had told the police that he and the victim "used to get high together and they had a conflict" and the victim "fought him over a crack pipe." According to the Petitioner, Trial Counsel "was supposed to talk to the witness and have him called as a witness on my part" but that, at trial, Trial Counsel told him "she hadn't had a chance to speak with him, personally."

The Petitioner stated that he decided to testify on the last day of his trial. He claimed that Trial Counsel had not prepared him to testify.

The Petitioner also discussed the autopsy report with Trial Counsel and told her that the report was incorrect in its identification of slash marks across the victim's neck. He testified:

> And O. C. Smith had stated that there were several slash marks, like a saw mark, going across her neck and I disputed that saying that never happened. There's no way it could have been, because you know, because the events that happened it was just a knife mark up to the neck. But, there wasn't slash marks.

He also testified that, prior to trial, he told Trial Counsel that he thought the victim was dead when he disposed of her body. He did not remember testifying at trial that he had thought she might still be alive when he disposed of her body. However, he recalled testifying at trial that he left the victim in the street "in hopes it would get her some help."

The Petitioner stated that he told Trial Counsel that, in addition to disagreeing with Dr. Smith's findings of slash marks, he disagreed with his findings of "road rash" on the victim's face. The Petitioner stated that the "road rash" could have been carpet burns resulting from the "wild sex" he and the victim had. Trial Counsel failed to explore this possibility with a "second opinion."

The Petitioner also testified that Trial Counsel was not adequately prepared or adequately focused during trial, blaming her pregnancy.

On cross-examination, the Petitioner stated that he wanted to rely on self-defense, but Trial Counsel told him that Tennessee did not have a "self defense law." Accordingly, they focused on "first aggressor." The Petitioner explained that the "first aggressor" defense required hin to prove that the victim had been the first aggressor and that he had been defending himself against her. In support of this defense, he wanted Trial Counsel to introduce the victim's sister's statement and statements from "the eye witness" that "the victim was known to carry knives and that the victim was known as being dangerous, fighting all of the time." The Petitioner reiterated that, at the time he disposed of the victim's body, he "presumed she was dead" because of the multiple stab wounds he had inflicted and the blows he had inflicted to her head. She also was bleeding profusely. He did not think that calling for aid would have helped the victim.

Trial Counsel, a member of the Shelby County Public Defender's Office, testified that she represented the Petitioner at trial and that she was assisted by another lawyer. She was also assisted by an investigator. Initially, she sought a mental evaluation on the Petitioner in hopes of obtaining information helpful to their defense. She testified, however, that "some information that would not be helpful for us came out in that and so [she] stopped with that and [she] didn't bother to explore that any further."

She described the Petitioner's case as "hard," but she thought that his confession was "a plus" because the crime would likely have gone unsolved otherwise. She also thought the evidence fit his description of the events and, accordingly, tried to plea bargain with the prosecution for a second degree murder conviction. She thought she had eight witnesses who would describe the victim's aggressiveness and her reputation as "a crack user and a hooker and somebody that carried weapons." The State, however, refused to drop the charge to second degree murder. Then, at trial, "nobody wanted to talk badly about [the victim]." Trial Counsel intended to put Terry Austin on the stand "as the first aggressor witness" but when she "got him in the hot seat he wouldn't give the statement that he had given [her] investigator and he was just kind of hemming and hawing around and [they] decided he wouldn't be good for [the defense] and so [they] decided not to call him." Trial Counsel stated that she had been "very frustrated" that the potential witnesses for the defense would not "say the things that they had said to the police."

During her conversations with the Petitioner, he consistently told her that he thought the victim was dead when he disposed of her body and that he had not called for medical attention. She explained that the Petitioner "was kind of freaked out and he did some crack and so he didn't call 9-1-1." At trial, however, he testified "that he left her alive in the ditch to get medical attention." She explained,

-14-

I don't know specifically what I asked him, but I think I tried to -- his story never changed, so I didn't anticipate that he was -- I don't know why he said something like that, I was completely shocked. I think that I tried to gently lead in, without leading, back into that she was really dead, and I wasn't able to do that, so I left it alone. And I knew that that would be bad for our case. But, he did a fairly decent job on the stand, but that was completely out of the blue.

When asked why she did not obtain an independent medical evaluation of the victim, Trial Counsel testified,

I didn't see it as a critical issue, I mean, it really didn't matter in actuality whether she was dead or alive. It mattered what was in [the Petitioner's] head and what he perceived, because that to me went to his intent. And he perceived that there had been an argument and he stabbed her and he thought he killed her. And so, that was our defense.

Trial Counsel testified that her pregnancy did not interfere with her representation of the Petitioner.

On cross-examination, Trial Counsel stated that, in her analysis of the case, the State had no proof of premeditation. When asked if she was aware of case law setting forth the proposition that failing to seek medical attention for the victim can be proof of premeditation, Trial Counsel responded, "That's only evidence of premeditation if you leave the victim alive, you think they are alive. But, that wasn't the case here." She acknowledged that "it became the case . . . when [the Petitioner] testified to something that he'd never told [her] before." Prior to that time, she explained, the State's theory of premeditation rested on the number and severity of the victim's wounds.

Trial Counsel stated that she met with Dr. Smith prior to trial. She did not consider getting an independent medical evaluation of the victim because the Petitioner had maintained consistently that he believed the victim to have been dead at the time he disposed of her body. She added,

I mean, had I thought about it, I don't think I probably would have wanted one, because if another person said she was alive, then that is something else for the state to use that they probably wouldn't have used before. And had they said she was dead, I don't, I mean, that doesn't. The risk of having them support O. C. Smith makes me not want to do that. I want to use the good stuff that I've got, which is his statement and the evidence, the

crime scene evidence that is supporting his statement of how the events happened.

Trial Counsel could not remember whether she cross-examined the victim's sister at trial but stated that the witness "wasn't going to say anything bad about her sister." She described her handling of this witness as a tactical decision based on her and/or her investigator's conversations with this witness.

Trial Counsel testified that, in her opinion, this had been a second degree murder case until the Petitioner testified that he left the victim alive so that she might receive medical attention. When asked if, at that point, she "wish[ed]" that she had a competing medical expert opinion to refute Dr. Smith's, she responded, "I still don't think it would have mattered at that point, because he said he thought that she was alive. And that would show to me that he thought she was alive and he left her there to die."

Dr. O'Brian C. Smith testified at the post-conviction hearing that upon conducting the autopsy of the victim he concluded that a scrape on the victim's forehead had been a "road rash" injury. He testified to that effect at the Petitioner's trial. Upon further review of the photographs taken during the autopsy in preparation for the post-conviction hearing, however, he determined that the scrape was also consistent with the victim having been dragged through a window. He opined that the scrape to the forehead occurred while the victim was still alive and that this injury preceded the injuries that occurred to the victim's lips and nose. Dr. Smith continued to believe that the lip and nose injuries were "road rash" injuries. Contrary to his testimony at trial, however, he opined at the post-conviction hearing that these road rash injuries had occurred *after* the victim's death.

Dr. Smith testified that the injuries to the victim's neck were "non-survivable." He added that "[t]here were also multiple stab wounds to the liver which would be expected to continue bleeding until the patient would die." He stated that it was "highly unlikely" that the victim would have survived even had the Petitioner sought medical help.

On the basis of this proof, the post-conviction court denied relief, concluding (1) that the Petitioner had failed to prove that Trial Counsel performed deficiently and (2) that he had adduced "absolutely no proof that [Trial Counsel's] conduct prejudiced the outcome of the proceeding."

**Standard of Review**

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

**Analysis**

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[1] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

---

[1] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

In this case, the Petitioner alleges that Trial Counsel was ineffective in failing to negate one aspect of the State's proof of premeditation, i.e., that the Petitioner abandoned the victim after inflicting life-threatening wounds and, while thinking that she might still survive, nevertheless failed to seek medical aid for her. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (recognizing that a defendant's failure to render aid to his or her murder victim may be a fact indicative of premeditation); see also State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009). The Petitioner claims that Trial Counsel should have obtained independent medical proof that the victim was already dead at the time the Petitioner decided to remove the victim from his residence and place her body in a public street in hopes that someone else might come to her rescue. He argues that

> one cannot form the culpable intent to murder a victim after the victim is already deceased. Had trial counsel shown that the victim died soon after her injuries, she could have argued to the jury that [the Petitioner's] failure to seek medical attention was not evidence of pre-meditation [sic]. Therefore, the jury would not have found [the Petitioner] guilty of first-degree murder.

We agree with the post-conviction court that the Petitioner is not entitled to relief, for several reasons. First, we are constrained to point out that Dr. Smith's testimony does not support the Petitioner's theory. Dr. Smith testified at the post-conviction hearing that the victim was still alive when she received the scrape to her forehead. He also opined that this injury was consistent with having been dragged through a window. The Petitioner dragged the victim through a window prior to placing her in his truck and driving her to the location where he placed her body. However, the Petitioner testified at trial that, after he finished stabbing the victim and she was lying on the floor, he "made a decision." He continued: "I mean it wasn't a logical decision, I just made a decision that I was going to place her in the truck and place her somewhere where somebody could find her and that's what I did." That is, the Petitioner decided to remove the victim from his residence and place her in a public location *prior to pulling her through the window and into his truck*. According to Dr. Smith's testimony at the post-conviction hearing, the victim was still alive at the time the Petitioner made this decision. Thus, although Dr. Smith testified at the post-conviction hearing that the "road rash" injuries were inflicted after the victim's death, which was contrary to Dr. Smith's testimony at trial, Dr. Smith's testimony about the forehead injury nevertheless supports the State's theory that the Petitioner engaged in conduct indicative of premeditation at the time he decided to dispose of the victim without attempting to obtain medical aid for her. Therefore, the Petitioner has failed to adduce proof that Trial Counsel could have obtained a medical opinion that the victim was dead at the time the Petitioner decided to abandon her without seeking medical attention for the numerous stab wounds he had inflicted.

Second, the success of the Petitioner's argument depends upon this Court concluding that there is a reasonable probability that the jury would not have convicted him of premeditated murder if Trial Counsel had elicited independent expert proof that the victim was dead at the time the Defendant decided to remove her body from his residence and place it on a public street. The record, however, does not support this conclusion. The jury had adequate proof at trial to determine that the Petitioner formed the requisite culpable mental states of intent and premeditation with respect to killing the victim during the attack itself, as opposed to after he had inflicted the fatal wounds. As this Court set forth in its opinion in the direct appeal of this case, failure to render aid is just one circumstance from which a jury may infer premeditation. Other circumstances from which a jury may infer premeditation include the particular cruelty of the killing, the infliction of multiple wounds,[2] and the destruction or secretion of evidence after the killing. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's use of multiple weapons in succession may also support an inference of premeditation. See State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004). All of these circumstances were present in this case.

The defense theory, as argued by Trial Counsel during closing argument, was that the killing occurred after the Petitioner crossed the line from self-defense to an intentional or knowing killing while he was in a state of passion produced by the victim's provocation such that he acted in an irrational manner, i.e., voluntary manslaughter. See Tenn. Code Ann. § 39-13-211(a) (2003). The Petitioner testified that he was acting in self-defense when he stabbed the victim and that he was under the influence of crack cocaine. The Petitioner maintained, in essence, that he was not capable of premeditation at the time he was inflicting the fatal injuries to the victim. The jury, however, was entitled to reject the defense theory of self-defense/irrational behavior. The jury also could determine that he had formed the requisite culpable mental states of intent and premeditation during the attack itself based upon the type and extent of the injuries the Petitioner inflicted, his use of multiple weapons on the victim, and his subsequent attempts to destroy or secret some of the evidence. Any proof that the victim had been dead at the time he decided to dispose of her body would not have countered this conclusion.

Finally, even if such proof might have inured to the Petitioner's benefit, the Petitioner has failed to demonstrate that Trial Counsel was deficient in failing to pursue this theory of defense. Prior to testifying at his trial, the Petitioner had led Trial Counsel to believe that he thought the victim was already dead at the time he decided to dispose of her body. Therefore, Trial Counsel had no reason to suspect that the Petitioner would suddenly incriminate himself with another possible circumstance indicating premeditation in causing

---

[2] However, proof of multiple wounds, in and of itself, is not sufficient to establish premeditation. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

the victim's death. Accordingly, Trial Counsel had no reason to gather additional proof that the victim was dead at the time the Petitioner decided to dispose of her body. Moreover, the Petitioner has failed to prove that such proof was available because Dr. Smith testified that the victim was still alive when the Petitioner moved her to his truck.

In sum, the Petitioner has failed to demonstrate by clear and convincing evidence that Trial Counsel was deficient in failing to prove that the victim was dead when the Petitioner decided to remove her body from his residence. The Petitioner further has failed to demonstrate by clear and convincing evidence that, had Trial Counsel elicited such proof, there is a reasonable probability that the jury would not have convicted him of first degree premeditated murder. Accordingly, the Petitioner has failed to establish that he is entitled to post-conviction relief.

## Conclusion

For the foregoing reasons, we affirm the post-conviction court's denial of the Petitioner's claim for relief.

_____
JEFFREY S. BIVINS, JUDGE